**SPECIALTY COMPOSITES,**
Plaintiff/Cross–Appellant,

v.

**CABOT CORP., Defendant/Appellant.**

Nos. 87–1456, 87–1457.

United States Court of Appeals, Federal Circuit.

April 27, 1988.

Rudolf E. Hutz, Connolly, Bove, Lodge & Hutz, Wilmington, Del., argued for plaintiff/cross-appellant. With him on the brief were James M. Mulligan, Jr., Harold Pezzner and Mary W. Bourke. Also on the brief was Ansel B. Chaplin, Chaplin & Milstein, Boston, Mass., of counsel.

Harold Hestnes, Hale & Dorr, Boston, Mass., argued for defendant/appellant. With him on the brief was Thomas N. O'Connor. Also on the brief were Eugene F. Buell and Lynn J. Alstadt, Buell, Ziesenheim, Beck & Alstadt, Pittsburgh, Pa., and Jack Schuman, Indianapolis, Ind., of counsel.

Before MARKEY, Chief Judge, DAVIS, Circuit Judge, and NICHOLS, Senior Circuit Judge.

DAVIS, Circuit Judge.

Cabot Corporation's (Cabot) United States Patent No. Re. 29,487 ('487 patent) claims certain plastic foam earplugs used for hearing protection. Specialty Composites (Specialty) brought an action in the United States District Court for the District of Massachusetts seeking a declaratory judgment that the '487 patent is invalid, unenforceable, and not infringed by the polyurethane foam earplugs manufactured and sold by Specialty. Cabot counterclaimed for infringement. After a bench

trial, the court ruled that Specialty had failed to establish that Cabot's patent is invalid for obviousness under 35 U.S.C. § 103 or unenforceable for inequitable conduct during procurement. However, the court found that Specialty's earplug products do not infringe.[1] On appeal and cross-appeal, we reverse the decision of non-infringement and affirm the holdings of nonobviousness and enforceability.

## I. *Background*

The invention is a type of earplug used to protect the ear from excessive noise. In 1971 Ross Gardner, an employee of Cabot[2], discovered that superior protective earplugs could be made from slow recovery plastic foams. When these polymeric foams are compressed they rebound to their original shape relatively slowly. If earplugs made of slow recovery foams are squeezed to a diameter smaller than the ear canal and inserted into the ear, they recover towards their original shape over a period of several seconds and seal the ear canal. Compared to other hearing protection devices then available, these earplugs had the advantage of a universal fit, comfort, convenience and effective noise attenuation.

Gardner found that it was necessary to select a foam with a composition that imparted mechanical properties falling within certain ranges. If the foam rebounded too quickly the earplugs were difficult to insert; if the foam recovered too slowly the earplugs could fall out before they expanded to contact the ear canal. In addition, if the expanded earplug exerted too much pressure, it would not be comfortable. Accordingly, the inventor quantified the mechanical parameters that would be suitable for his hearing-protective earplugs and found examples of slow recovery foams which met these specifications. Cabot obtained a patent for this invention, United States Patent No. 3,811,437, issued on May 21, 1974. Cabot later initiated reissue proceedings to cure some technical defects and broaden the scope of protection. The patent was reissued on December 6, 1977 as Re. 29,487, the patent in issue in this case.

The broadest claims in the '487 patent are claims 1 and 11. They provide:

1. An earplug of generally cylindrical shape having a diameter of between 3/8 and 3/4 inch, a length of between 1/2 and 1 inch and composed of a resilient plasticized polymeric foam *having a sufficiently high concentration of organic plasticizer* therein as to provide said foam with a rate of recovery from 60 percent compression thereof to 40 percent compression thereof of from 1 to 60 seconds and an equilibrium pressure at 40 percent compression thereof of from 0.2 to 1.3 p.s.i.

\* \* \* \* \* \*

11. An earplug having a size and shape adapted to be compressed and inserted into the human ear canal and there allowed to expand and obturate the ear canal, said earplug comprising a resilient plasticized polymeric foam *having a sufficiently high concentration of organic plasticizer* therein as to provide said foam with a rate of recovery from 60 percent compression thereof to 40 percent compression thereof of from 1 to 60 seconds and an equilibrium pressure at 40 percent compression thereof of from 0.2 to 1.3 p.s.i. [emphasis added].

The invention thus contains six elements: (1) an earplug; (2) of a size and shape to be compressed and inserted into the ear canal; (3) made of resilient plasticized polymeric foam; (4) having a sufficiently high concentration of organic plasticizer to achieve; (5) a rate of recovery within a specified range; and (6) an equilibrium pressure within a specified range.

Cabot first manufactured and marketed this earplug in 1971. The earplugs were

1. Under Fed.R.Civ.P. 54(b), the court determined that final judgment be entered as to validity, noninfringement and enforceability.

2. At that time Gardner was an employee of National Research Corporation. In 1978, National Research Corporation merged into Cabot. The Cabot earplugs are manufactured by E–A–R Corporation, a subsidiary of Cabot. For simplicity, this opinion will refer only to Cabot.

made from polyvinylchloride foam as described in the examples in the specification of the patent. The product was a commercial success, and captured more than one-third of the hearing protection market by 1983.

Officials at Specialty became interested in manufacturing foam earplugs after seeing Cabot earplugs in 1976. They used the Cabot patent as a guide in designing their own competing earplugs which admittedly fall within the size, shape, recovery rate and equilibrium pressure criteria of the patent claims. Specialty believed that they could design around the Cabot patent by using an internally plasticized polyurethane foam. They felt that this avoided the limitation that the foam must have a "sufficiently high concentration of organic plasticizer" to produce the specified properties.

"Plasticizer" is a term of art in polymer chemistry and in the plastics industry. Although the chemical compositions of plastics differ, they are all polymers. Polymers are large molecules consisting of repeating units of small molecules. The small molecules, called monomers, are linked together covalently to form the long chains of the polymer molecule. For example, the polyvinylchloride used in the Cabot earplug consists of vinyl chloride molecules strung together in long chains.

The long polymer molecules of plastics can interact with each other to produce structures that are rigid and inflexible. If the interactions that bind neighboring polymer molecules to each other are reduced, the resulting material may be softer, more flexible, and have a lower melting point. "A plasticizer is a material incorporated in a plastic to increase its workability and its flexibility or distensibility (elongation)." J. Sears & J. Darby, *The Technology of Plasticizers* 2 (1982). "Plasticization ... may be achieved (1) by compounding the given polymer with a low molecular weight compound or with another polymer; and (2) by introducing into the original polymer a comonomer which reduces crystallizability and increases chain flexibility." Immergut & Mark, "Principles of Plasticization," in 48 *Advances in Chemistry* 1 (1964).

There are two main groups of plasticizers: internal and external plasticizers. Internal plasticizers ... are actually a part of the polymer molecule—e.g. a second monomer is copolymerized into the polymer structure, thereby making it less ordered, and therefore, more difficult for the chains to fit closely together. This softens the polymer.... Another type of internal plasticizer involves the introduction of side chains.... External plasticizers are compounds of low vapor pressure which, without chemical reaction, interact with the polymer, mainly at elevated temperature, by means of their solvent, or swelling power.

*Id.* at 2. Since external plasticizers are not chemically bound to the polymer molecules, but instead are merely inserted between them, external plasticizers can be extracted from the polymer with solvents.

Plasticizers produce plasticization by a variety of different molecular mechanisms. Different plasticizers are used for different polymers. Plasticizers may even be low molecular weight polymers formed from the same monomers as are used to form the longer polymer chains of the structural plastic. Essentially, "plasticizer" is a functional concept defined by its effect, the softening of a plastic, rather than by the nature of the chemical species involved.

## II. *Infringement*

One critical question in this case is whether or not Specialty's polyurethane foam falls within the limitation in the claims that the foam have a "sufficiently high concentration of organic plasticizer" to achieve the specified recovery rates and equilibrium pressures. The district court held that Specialty's foam does not:

In my opinion, Specialty has avoided infringement by achieving the desired results in a different manner than using an organic plasticizer. A "sufficiently high concentration of organic plasticizer" is a critical limitation on all claims of the patent. The prosecution history indicates that the Gardner invention relates to an externally plasticized polymer—a plasticizer added to the polymer after it

has been formed, separately from the polymer. This, I find, is what the words meant to the examiner. There is no acceptable evidence that Specialty has added an organic plasticizer to the polymer structure. The evidence is that it has, as stated above, used chain stopping and under-indexing. They changed the molecular structure rather than adding something to it.

*Specialty Composites Corp. v. Cabot Corp.*, No. 78–3170, slip op. at 12–13 (D.Mass. May 12, 1987).

An issue of infringement raises two fundamental questions: (1) what is patented—this requires interpretation of the scope and meaning of the claim language; and (2) whether the patent, so interpreted, is infringed—whether what is claimed has been made, used or sold by another. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569, 219 USPQ 1137, 1140 (Fed.Cir. 1983). Cabot argues that the district court erred in construing "having a sufficiently high concentration of organic plasticizer" to mean "externally plasticized polymer ... added to the polymer after it has been formed...."

*Scope of "plasticizer" in the '487 patent:* Claim interpretation is a matter of law. *Id.; Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 866, 228 USPQ 90, 93 (Fed. Cir.1985). In reviewing the interpretation of the meaning of claims, the reviewing court need not defer to the district court either under a "clearly erroneous" standard or otherwise. *Id.*[3] "To ascertain the true meaning of disputed claim language, resort should be made to the claims at issue, the specification, and the prosecution history.... Moreover, claims should be construed as they would be by those skilled in the art." *Id.* at 867 (citations omitted). Likewise, a review of other claims in the same patent can aid in deciding the scope of a particular claim. *Fromson*, 720 F.2d

at 1570. *See also McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 673–75, 221 USPQ 944, 948–951 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984); *Fromson*, 720 F.2d at 1569–71, 219 USPQ at 1140–42.

■ The current dispute centers on the meaning of the term "plasticizer" in the claims of the '487 patent and whether the accused foam contains "plasticizer" (properly interpreted).[4] At trial Specialty's expert witness took the position that "plasticizer" is a narrow term that could never be applied to internal plasticization. However, this assertion, contested by Cabot, was contradicted by a large amount of evidence in the record which shows that other workers skilled in the art use "plasticizer" as a broad, inclusive term. Some of the technical literature in the record explicitly refers to "internal plasticizers", e.g. Immergut & Mark, *supra.* Other treatises (which do not explicitly define plasticizer) discuss external and internal plasticization together as variations of the same general concept, and use "plasticizer" "plasticization" and "plasticized" almost interchangeably. None of the literature states or implies that the term "plasticizer" is inapplicable to internal plasticization. Thus, an examination of the way that the patent term "plasticizer" is used by those skilled in the art does not confirm the district court's view that "plasticizer" in this patent must be limited to external plasticizers and excludes internal plasticizers. This material also fails to support the view that a plasticizer must be "added to the polymer after it has been formed, separately from the polymer." On the contrary, the evidence contains examples of plasticizers, both internal and external, that are added to the reaction mixture before polymerization or are formed simultaneously with the polymer in the same reaction mixture. E.g., "Sometimes the plasticizer may not be

---

3. The question of whether an accused device infringes *properly interpreted* claims is a question of fact that is reviewed under the "clearly erroneous" standard. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118, 1125, 227 USPQ 577, 583, 589 (Fed.Cir.1985) (in banc); *Fromson*, 720 F.2d at 1569, 219 USPQ at 1140.

4. Both parties accept that all of the chemicals in dispute are organic. For purposes of our analysis, "plasticizer" and "organic plasticizer" are synonymous.

added as a separate material but may be produced *in situ* by cleaving occasional polymeric molecules to produce smaller ones." J. Sears and J. Darby, *The Technology of Plasticizers* 2 (1982). The short of it is that the word "plasticizer," as used by those skilled in the art, is not generally limited to external plasticizers, nor to materials "added to the polymer after it has been formed."

■ We must then determine whether the term acquired a more restricted meaning in the claims of the '487 patent by intent or during prosecution. Where the meaning of words in a claim is in dispute, or where different members of the community of those skilled in an art give the same term different meanings, the specification and prosecution history can provide relevant information about the scope and meaning of the claim. *Loctite,* 781 F.2d at 867, 228 USPQ at 93. "The descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based upon the description. The specification is, thus, the primary basis for construing the claims." *Standard Oil Co. v. Am. Cyanamid Co.,* 774 F.2d 448, 452, 227 USPQ 293, 296 (Fed.Cir.1985). The specification of the '487 patent refers only to plasticizers. It never uses the terms "external" or "internal" plasticizer and does not implicitly distinguish between them. The three examples of foams in the specification are externally plasticized polyvinylchloride. However, particular embodiments appearing in the specification will not generally be read into the claims. *Loctite,* 781 F.2d at 867, 228 USPQ at 93; *Fromson,* 720 F.2d at 1568, 219 USPQ at 1139. What is patented is not restricted to the examples, but is defined by the words in the claims if those claims are supported by the specification in the manner required by 35 U.S.C. § 112. Nowhere does the specification of the '487 patent teach that external plasticizers *must* be used. On the contrary, some internally plasticized polymers are expressly disclosed in the specifi-

cation.[5] The emphasis is on the suitability of any plasticizer that will achieve the specified properties, not on the particular class of plasticizer. In fact, the specification expressly teaches that other polymeric foams including polyurethane (i.e., diisocyanate polymers) can be used. The specification states: "Any flexible polymeric material which can be foamed so as to result in an ultimately formed earplug structure meeting the recovery rate and pressure criteria set forth hereinabove constitutes a satisfactory material of construction in the earplug of the invention."

■ During prosecution the examiner suggested that the claims be limited to polyvinylchloride foams. When this was rejected, the examiner accepted the applicant's position that there was no such limitation on the composition of the polymer. Specialty concedes that many plastics besides polyvinyl chloride are covered by the patent. Since the claims cover a variety of polymers, it follows that "plasticizer" (in the claims) should be read to include plasticizers appropriate for plasticizing other types of foam. Though polyvinylchloride entails a very high concentration of external plasticizer added to preformed polymer, the specification does not require a numerically high concentration of external plasticizer, but only a "sufficiently high concentration of organic plasticizer" to achieve specified results. Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims. *Lemelson v. United States,* 752 F.2d 1538, 1551–52, 224 USPQ 526, 534 (Fed.Cir.1985).

Moreover, the scope of a particular claim can often be determined on inspection of other claims. *Fromson,* 720 F.2d at 1570, 219 USPQ at 1140–41. "Where some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or escape infringement." *Kalman v. Kimberly–Clark Corp.,* 713 F.2d 760, 770, 218 USPQ 781, 788 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d

5. The internally plasticized polymers are polyvinyl chloride/vinyl acetate copolymers, vinyl chloride/vinyl stearate copolymers, and vinyl chloride/vinylidene chloride copolymers.

687, 224 USPQ 520 (1984). Dependent claims 8 and 16 expressly recite the presence of an external plasticizer. These claims state:

8. The earplug of claim 1 wherein said polymeric foam is formed from a polyvinylchloride plastisol.

16. The earplug of claim 11 wherein said polymeric foam is formed from a polyvinylchloride plastisol.

Plastisol is a term of art meaning a mixture of polymer and external plasticizer. These dependent claims add two limitations beyond independent claims 1 and 11: (1) the earplugs must be made of polyvinlychloride foam, and (2) the polyvinylchloride foam must be externally plasticized. The limitation to polyvinylchloride in the dependent claims does not, of course, imply that the foam in claims 1 or 11 must be polyvinylchloride. On the contrary, it supports the inference that the foam in claims 1 and 11 is not restricted to polyvinylchloride. Similarly, the recitation in the dependent claims that the foam be formed from a plastisol, i.e., externally plasticized, implies that the independent claims 1 and 11 are not so limited. An accepted rule of claim construction suggests that, since the dependent claims 8 and 16 add an external plasticizer as a limitation, the broader independent claims 1 and 11 do not have this limitation. *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574, 225 USPQ 236, 239 (Fed. Cir.1985).

Prosecution history is still another tool for claim construction. *McGill*, 736 F.2d at 673, 221 USPQ at 949. "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil*, 774 F.2d at 452, 227 USPQ at 296. The terms "external" and "internal plasticizer" were never used by the applicant or the examiner during prosecution. The prosecution history shows that the phrase "having

a sufficiently high concentration of organic plasticizer" was added at the suggestion of the examiner to avoid a prior art reference. The examiner originally rejected the application over U.K. Patent 733,542 (the Hultgren patent), which discloses earplugs made from rapid recovery foam. The examiner felt that the Hultgren patent inherently disclosed that the recovery rate and equilibrium pressure of a foam could be varied because that patent referred to the possibility of manipulating the physical properties of the foam by controlling the density of the plastic and the size of the pores. The record shows that the phrase "having a sufficiently high concentration of organic plasticizer" was added to narrow the claims of the '487 patent to foam earplugs in which the desired slow-recovery properties are achieved by chemically plasticizing the foam.[6] There is thus no evidence that Cabot either intended to disclaim any particular chemical method of plasticizing foam, or that it did so by implication. In particular, there is no indication that Cabot gave up any claim to internally plasticized polymers when the claims were amended or that the examiner required any such exclusion. The trial court was incorrect when it found that the prosecution history showed that the Gardner invention related only to external plasticization. That determination was clearly erroneous.

In sum, the understanding of the art, the language of the other claims, the specification and the prosecution history, all show that the term "plasticizer" in the claim language is not restricted to external plasticizers. The district court erred in reading this limitation into the claims before us. Those claims should be construed to encompass, as well, internally plasticized foams.

■ *Infringement by Specialty's device:* The district court found as a matter of fact that the accused device is made of internally plasticized polymeric foam. The court also found that the accused earplugs fall

---

6. Therefore, if Cabot was trying to assert rights under the doctrine of equivalents to foam earplugs having recovery rates and equilibrium pressures controlled by manipulating the pore size or density of the plastic, the patentee might

be estopped. *Hughes Aircraft v. United States,* 717 F.2d 1351, 1362, 219 USPQ 473, 480–81 (Fed.Cir.1983). However, altering pore size or density of the foam is not an issue in this suit.

within all of the other limitations of claims 1 and 11. Therefore, when the claims are properly interpreted, the factual findings on infringement (none of which is challenged) compel a holding of infringement. It follows that the finding of noninfringement must be reversed as based on an erroneous reading of the claims.

There is another basis for finding that the Specialty earplugs infringed the '487 patent. Evidence introduced at the trial shows that the accused earplugs actually contain both external plasticizers and internal plasticizers. Laboratory tests conducted by both sides showed that organic materials were extracted by solvents from the accused earplugs, and that after these oily liquid substances were extracted the foam became less resilient. Extractable materials that increase the flexibility of plastics are, by definition, external plasticizers. The presence of external plasticizers is consistent with the chemistry of the polyurethane foams used by Specialty. The polyurethane used by Specialty was plasticized by the techniques of chain stopping and underindexing.[7] Specialty's expert testified that the benzyl alcohol chain stopper reacted with precursor monomers to produce, among other things, small linear polymers that contributed to the plasticization of the polyurethane. Specialty's expert also testified that the extract contained small linear polymers of polyurethane. Specialty tried to characterize these small molecules as "polymer" rather than "plasticizer." Although both are polymers, a low molecular weight linear polyurethane polymer that is an oily liquid is quite a different chemical entity from a high molecular weight, branched, cross-linked polyurethane polymer that forms a solid. Any small molecule that is not bound to the large structural polymer molecules and that contributes to plasticization is by definition an external plasticizer. It is irrelevant that it is made from the same monomers as the polyurethane that it plasticizes.

*See* Sears & Darby, *supra.* The trial judge's finding that the foam in the Specialty earplugs did not contain external plasticizers was clearly erroneous.

In some tests the extracted foam no longer achieved the recovery rate specified in the patent claims. Conversely, in at least some cases the foam had a sufficiently high concentration of external plasticizer to achieve the specified recovery rate. The Specialty earplugs therefore infringed even under the erroneous, more restrictive, interpretation of the claim language adopted by the district court.

Because the properly interpreted claims are literally infringed, we need not reach the question of whether there is infringement under the doctrine of equivalents.

### III. *Obviousness*

■ In its cross-appeal, Specialty argues that the district court erred when it rejected Specialty's defense that the '487 patent would have been obvious under 35 U.S.C. § 103. In reviewing a decision of nonobviousness, the ultimate legal conclusion of obviousness is scrutinized as a matter of law, *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1568, 1 USPQ2d 1593, 1597 (Fed.Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). But the analysis of obviousness must be based on several factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time when the invention was made; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966). *See, e.g., Custom Accessories, Inc. v. Jeffrey–Allan Indus.,* 807 F.2d 955, 958, 1 USPQ2d 1196, 1197 (Fed.Cir.1986). These factual findings underlying the legal conclusion of obviousness are reviewed under the "clearly erroneous" standard. *Loctite,* 781 F.2d at 872, 228 USPQ at 97; *see also*

7. Underindexing is a technique in which the polyurethane is prepared using an excess of its polyol monomer in relation to its polyisocyanate monomer. Chain stopping is a method of making polyurethane in which a monofunctional reagent is added during polymerization. The monofunctional reagent (benzyl alcohol was used in this case) reacts with the polyisocyanate in the reaction mixture, preventing further polymer chain growth at the site of the reaction.

*Panduit,* 810 F.2d at 1569, 1 USPQ2d at 1598; *In re De Blauwe,* 736 F.2d 699, 703, 222 USPQ 191, 195 (Fed.Cir.1984).

■ Specialty's main objection is that the district court did not follow the *Graham* analysis. Failure to base an examination of obviousness on the factual findings required by *Graham* can require that the case be remanded for those findings to be made. *Loctite,* 781 F.2d at 872–75, 228 USPQ at 97–99; *see also Custom Accessories,* 807 F.2d at 963, 1 USPQ2d at 1201–02. In this case the district court's discussion of obviousness does not mention *Graham.* It would have been preferable if the court had enumerated the *Graham* factors and systematically presented its analysis in terms of these factors. However, there is no reversible error if the required factual determinations were actually made and it is clear that they were considered while applying the proper legal standard of obviousness. "[W]e must be convinced from the opinion that the district court actually applied *Graham* and must be presented with enough express and necessarily implied findings to know the basis of the trial court's opinion." *Loctite,* 781 F.2d at 873, 228 USPQ at 98. A careful reading of the full opinion shows that the district court did make the specific factual findings required for a determination of obviousness or nonobviousness.

The court made specific findings on the scope and content of the prior art, and on the differences between the prior art and the claimed invention. Also, the judge explicitly reviewed and discussed each of the references relied upon by Specialty—the Hultgren, Kaps, Cantor and Mills patents for earplugs, the Mast and Simon patents for slow recovery foams, and the Cabot stock foam used to make the first '487 earplugs. The court concluded that the teachings in each of these references, individually or in combination, did not render the claimed invention obvious to one of ordinary skill in the art.

■ The court made the following specific findings on the scope and content of the prior art and the differences between the prior art and the claimed invention.[8] Hultgren (U.K. Patent 733,542), the reference viewed as most pertinent by the Patent & Trademark Office, has an axially oriented stem, is made from rapid recovery foam, does not provide any formulations for its foam and must be made in three sizes. Kaps (German Democratic Republic 26,819) discloses a conical plug punched from a sheet of polyvinylchloride and says nothing about controlling the properties of the plug. Adler's (West German Gbm 16 97 139) conical plug of polyurethane foam material says nothing about insertability or recovery properties. Cantor's earplug (U.K. Patent 578,613) is tubular with an open and a closed end, is not made completely of foam, and does not disclose recovery rates. Mill's earplug (U.S. Patent 3,736,929) has a dumbbell shape and is not made of foam. It was also expressly found that, although the Mills earplug was not disclosed to the examiner in the original application process, the Mills earplug was not pertinent prior art. The judge determined that none of the foam patents (e.g., Mast, U.S. Patent 2,964,424 and Simon, U.S. Patent 2,811,493), either individually or in combination, disclose a recovery rate and equilibrium pressure within the ranges described in the '487 patent. The court also rejected the idea that the prior existence of the stock foam that was used to make the first '487 earplugs was prior art that would render the patent obvious; the previous use of this foam was to encapsulate electronic components, and the court implied that this prior use would not suggest its use for earplugs. The opinion noted that prior art suggesting that earplugs should be made of dense material taught away from the use of the Cabot slow-recovery foam.[9]

---

**8.** Most of this was done in discussing anticipation (not raised on this appeal) but the part of the opinion on obviousness referred to that earlier discussion.

**9.** The court also found that the stock foam had not been sold more than one year before filing the application. Actions by the same inventor occurring within the statutory one-year grace period under 35 U.S.C. § 102(b) are not prior art which will render the inventor's work antici-

■ The court framed its analysis of the level of skill in the art in terms of someone with a very high degree of skill in the art, comparable to the president of Specialty. If the invention here would not have been obvious to one of extraordinary skill, it follows that in this case it would not be obvious to one with lesser skills. Any error in choosing too high a level of skill would not be prejudicial to Specialty, and would not be grounds for reversal. *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1574, 230 USPQ 81, 86 (Fed. Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987).

Objective evidence of nonobviousness was properly considered. *Graham,* 383 U.S. at 17–18, 86 S.Ct. at 693–94; *Stratoflex Inc. v. Aeroflex Corp,* 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed.Cir.1983); *W.L. Gore & Assoc. v. Garlock,* 721 F.2d 1540, 1555, 220 USPQ 303, 314 (Fed.Cir. 1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Weight was given to the commercial success of the earplugs and the court determined (after considering the alternative explanations for success advanced by Specialty) that this success was due to the merits of the invention. Thus, the court found the requisite nexus between commercial success and nonobviousness. *Stratoflex,* 713 F.2d at 1539, 218 USPQ at 879; *Cable Elec. Prods. v. Genmark, Inc.,* 770 F.2d 1015, 1026, 226 USPQ 881, 887 (Fed.Cir.1985). The court also considered evidence that at the time of the invention the art taught away from the invention. Those skilled in the art were looking to higher mass and denser materials to block sound. Mr. Gardner went in a direction different from that of others in the art, and his invention thus produced unexpected results. Unexpected results provide objective evidence of nonobviousness. *United States v. Adams,* 383 U.S. 39, 51–52, 86 S.Ct. 708, 714, 15 L.Ed.2d 572, 148 USPQ 479, 483–84 (1966); *Lindemann*

*Maschinenfabrik GMBH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1461, 221 USPQ 481, 488 (Fed.Cir.1984). The judge likewise noted the evidence that Specialty closely copied the invention in the '487 patent. "[C]opying the claimed invention, rather than one in the public domain, is indicative of unobviousness." *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1000, 228 USPQ 562, 565 (Fed. Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986).

The end-result is that the opinion of the district court shows that the court did make sufficient factual findings—which are not clearly erroneous—concerning the scope and content of the prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in the art, and objective evidence of nonobviousness. The opinion also shows that the court considered these factors in making its determination of nonobviousness. The trial court likewise properly analyzed obviousness in terms of the claimed invention as a whole at the time that the invention was made. It correctly framed its ruling in terms of Specialty's failure to overcome the statutory presumption of validity of the patent with facts established by clear and convincing evidence. *Lindemann,* 730 F.2d at 1459, 221 USPQ 481 at 486. The resulting conclusion that the invention as a whole would not have been obvious under 35 U.S.C. § 103 was right.

## IV. *Inequitable conduct during prosecution*

■ Inequitable conduct during prosecution of a patent must be proven by clear and convincing evidence of at least threshold levels of materiality and of intent to mislead. *J.P. Stevens & Co. v. Lex Tex, Ltd.,* 747 F.2d 1553, 1559, 223 USPQ 1089, 1092 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

pated or obvious, and it is not inequitable conduct to fail to disclose such art to the Patent & Trademark Office during prosecution. *Reactive Metals & Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578, 1583, 226 USPQ 821, 824–25 (Fed.Cir. 1985). Specialty vigorously disputes this factual finding and argues that the foam was "on sale"

more than one year before the application was filed, and thus must be viewed as prior art. It is not necessary to review this factual finding since the court found that consideration of the stock foam as prior art would not render the invention obvious.

Nondisclosed or false information is material if there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent. 37 C.F.R. § 1.56(a) (1987); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1363–64, 220 USPQ 763, 773 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Proof of the requisite intent does not require evidence of deliberate scheming; in proper circumstances gross negligence is sufficient. *Driscoll v. Cebalo,* 731 F.2d 878, 885, 221 USPQ 745, 751 (Fed.Cir.1984); *J.P. Stevens,* 747 F.2d at 1560, 223 USPQ at 1092. Materiality and intent are factual issues subject to the "clearly erroneous" standard of review. *J.P. Stevens,* 747 F.2d at 1560, 223 USPQ at 1094; *In re Jerabek,* 789 F.2d 886, 889, 229 USPQ 530, 532 (Fed.Cir.1986). Once the requisite threshold levels of both materiality and intent are found, the court makes the legal determination as to whether there has been inequitable conduct by considering both factors in a balancing approach. *American Hoist & Derrick,* 725 F.2d at 1363, 220 USPQ at 763; *J.P. Stevens,* 747 F.2d at 1560, 223 USPQ at 1092.

■■■■ Specialty argues that during prosecution Cabot's agent withheld information about (1) the Kaps and Mills patents, (2) Gardner's Italian patent (858,371) on slow recovery foam, and (3) the "prior art foams" manufactured and sold by Cabot's predecessor, National Research Corporation. The court found that the Kaps and Mills patents were not material. Although the opinion speaks of them as not being "highly material," the opinion as a whole indicates that the court did not impose an improperly high standard of materiality. The court cited *J.P. Stevens,* and must be presumed to have used the standard of materiality set forth in that case. *J.P. Stevens,* 747 F.2d at 1550, 223 USPQ at 1092. Specialty characterizes those two patents as critical references which an examiner would find more pertinent than art that was cited. We agree with the district court that this argument is overly strained. Failure to cite nonmaterial, cumulative references is not inequitable conduct. *Rolls–Royce, Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1107, 231 USPQ 185, 189 (Fed. Cir.1986). The court's finding that omission of those references did not reach the threshold of materiality for inequitable conduct was not clearly erroneous.

Specialty's arguments concerning the Gardner Italian patent on slow recovery foams and the prior existence of a commercially available foam is based on the theory that Cabot misled the examiner into thinking that slow recovery foams were entirely novel and absent in the prior art. The district court found that these references were material, but apparently did not find them to be particularly material, noting that the patent claims a mechanical device, and that the particular type of foam is "irrelevant to the invention." The court rejected the contention that these foams rendered the invention obvious.

■■■■ No intent to mislead was found. The court noted that, although Cabot did not cite the Italian patent when prosecuting the original patent, it called the Italian patent to the attention of the examiner during the reissue proceedings. With respect to the "prior art foam," Cabot's agent testified that during prosecution he had simply forgotten to cite the existence of stock slow recovery foam sold by Cabot. The court did not find this to be evidence of any intent to deceive the Patent Office, but does not appear to have explicitly ruled whether this amounted to gross negligence or merely simple negligence. Simple negligence, oversight, or an erroneous judgment made in good faith is insufficient to establish intent. *J.P. Stevens,* 747 F.2d at 1560, 223 USPQ at 1092. Instead, the court apparently found it unnecessary to analyze this question further because it found that the foam had not been sold more than one year before the patent application was filed. See n. 9, *supra.* Specialty challenges that factual finding. However, it is not necessary to review that finding since if any error was committed it was harmless. Even if the failure to mention the existence of Cabot's foams to the examiner rises above the threshold level of intent,

there was no reversible error in view of the low level of materiality of these foams found by the district court. Balancing the materiality and intent found by the court, Cabot did not engage in inequitable conduct during prosecution. If we were to give Specialty the benefit of the doubt by assuming that failure to mention the "prior art foam" rises to the level of gross negligence, we still have a low degree of materiality coupled with, at best, a low level of intent. "[W]here it is demonstrated that a reasonable examiner would merely have considered particular information to be important but not crucial to his decision not to reject, a showing of facts which would indicate something more than gross negligence or recklessness may be required, and good faith judgment or honest mistake might well be a sufficient defense." *American Hoist*, 725 F.2d at 1363, 220 USPQ at 773. On this point, too, Specialty has failed to sustain its burden of producing clear and convincing evidence of inequitable conduct.

### V. *Conclusion*

The decision of the district court that the Specialty earplugs did not infringe the '487 patent is reversed,[10] and the determination that the patent is valid and enforceable is affirmed. The case is remanded for further proceedings consistent with this opinion.

### COSTS

Costs to the Cabot Corp., the sole prevailing party.

REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.

---

**10.** On remand the district court should consider Cabot's assertion that Specialty's infringement was willful.