ZELLER PLASTIK, KOEHN, GRABNER & CO., Plaintiff,

v.

JOYCE MOLDING CORP., Defendant/Counterclaim Plaintiff,

v.

ZELLER PLASTIK, KOEHN, GRABNER & CO. and Zeller Closures, Inc., Counterclaim Defendant.

No. 88–133.

United States District Court, D. New Jersey.

Oct. 11, 1988.

James G. Webber, Dempsey, Dempsey & Sheehan, Summit, N.J., John Kurucz, Richard Klar, Kane, Dalsimer, Sullivan, Kurucz, Levy, Eisele & Richard, New York City, for plaintiff and counterclaim defendant Zeller Plastik, Koehn, Grabner & Co. and counterclaim defendant Zeller Closures, Inc.

Arnold Krumholz, Roy Wepner, Lerner, David, Littenberg, Krumhlz & Mentlik, Westfield, N.J., for defendant/counterclaim plaintiff Joyce Molding Corp.

HAROLD A. ACKERMAN, District Judge.

In this case, plaintiff, Zeller Plastik, Koehn, Grabner & Co. ("Zeller") seeks an order adjudging a patent it owns valid and enforceable, declaring that defendant, Joyce Molding Corp. ("Joyce") has infringed on the patent, enjoining defendant from further infringement, and ordering defendant to make an accounting of the damages arising out of the allegedly infringing activities.

This matter is presently before the Court on request of plaintiff for preliminary injunctive relief. I note that with the consent of the parties, deposition testimony, affidavits, declarations and exhibits were submitted in lieu of live testimony.

The original and amended complaints upon which this request is based were filed on January 12, 1988, and June 24, 1988, respectively. The essence of these complaints is plaintiff's allegation that defendant has infringed upon plaintiff's patent. In its answer, filed on March 3, 1988, defendant asserts five affirmative defenses and a four-count counterclaim.

In its affirmative defenses, Joyce asserts, *inter alia*, that it has not infringed on plaintiff's patent, that the patent is invalid and unenforceable, and plaintiff lacks standing to bring the present action. In its counterclaims, defendant also asserts that it has not infringed upon the patent in question and that the patent is invalid and unenforceable as the inventor failed to disclose material prior art to the patent examiner. Finally, defendant claims that plaintiff has violated the antitrust laws, engaged in unfair competition, and interfered with defendant's prospective economic advantage.

On March 24, 1988, Joyce filed its motion to add Zeller Closure, Inc. and Pittway Corporation as additional defendants on the counterclaims, pursuant to Federal Rule of Civil Procedure 13(h). On May 2, 1988, United States Magistrate Stanley R. Chesler granted Joyce's request to add Zeller Closures as a counterclaim defendant. Ap-

parently Joyce withdrew its request to add Pittway at that time. On July 1, 1988, however, Joyce renewed its motion to add Pittway as a counterclaim defendant.

Prior to this renewed motion, on May 26, 1988, plaintiff filed its request for preliminary injunctive relief. Hence, presently before me is Joyce's request to add a counterclaim defendant and plaintiff's request for injunctive relief.

In order to evaluate these matters, I shall first review the relevant factual background of this case. Hence, pursuant to Federal Rule of Civil Procedure 52, I make the following factual findings based on the record before me:

The patented invention at issue involves what has been referred to as "a snap hinge closure." The invention is more commonly known as the flip-top cap found on tubes of Colgate and Crest Toothpaste. On January 21, 1982, the inventor, Wilheim Weisinger, filed an application to receive a United States patent on this particular cap, for which he previously received a patent in Europe. On September 13, 1983, Weisinger received U.S. Patent No. 4,403,712 ('712) for this invention, whose object is to provide a "snap hinge which can be integrally made of plastic material and may constitute a part of a closure." *See* Patent No. 4,403,712, Column 2, Lines 7–10, attached as Exhibit 1 to defendant's response brief.

In the patent, the inventor made the following 25 claims:

"1. An integral snap hinge of plastic material, comprising:

"two hinge members adapted to be folded about a main geometric axis and being flexibly interconnected by at least one connecting element, the hinge members being flexibly interconnected at at least one additional place along the main geometric axis;

"film hinges having the connecting element interposed therebetween, the film hinges being divergent and at least one being inclined with respect to the main geometric axis; and

"at least one component of the snap hinge being resilient to perform the snap action.

"2. A snap hinge according to claim 1, wherein the connecting element has a relatively small, particularly pointed end.

"3. A snap hinge according to claim 1, wherein at least one pair of connecting elements is provided.

"4. A snap hinge according to claim 3, wherein the connecting elements of a pair have large ends facing each other.

"5. A snap hinge according to claim 4, wherein the large ends of the connecting elements are separated from each other by an aperture.

"6. A snap hinge according to claim 4, wherein the large ends of the connecting elements are interconnected by at least one bendable trough.

"7. A snap hinge according to claim 1, wherein the connecting elements are springs shaped like troughs, which diverge in the direction of the geometric main axis.

"8. A snap hinge according to claim 7, wherein the troughs are arcuate in cross-section.

"9. A snap hinge according to claim 7, wherein the troughs are V–shaped or polygonal in cross-section.

"10. A snap hinge according to claim 7, wherein the snap hinge is provided on an article which is adapted to be closed and the trough-shaped connecting elements protrude into the interior of the article when the latter is closed.

"11. A snap hinge according to claim 7, wherein the snap hinge is provided on an article which is adapted to be closed and the trough-shaped connecting elements face outwardly when the article is closed.

"12. A snap hinge according to claim 1, wherein the connecting elements are tensile elements which have a small to infinitely small elasticity in tension, and at least one of the hinge members is flexibly resilient, near the main geometric axis.

"13. A snap hinge according to claim 12, wherein the connecting elements are flat.

"14. A snap hinge according to claim 1, wherein the snap hinge consists of vacuum

formed, flexibly resilient sheet plastic material, each connecting element comprises at least two deep-drawn troughs, which constitute the film hinges.

"15. A snap hinge according to claim 14, wherein the troughs are separated from each other and from the hinge members by ribs.

"16. A snap hinge according to claim 15, wherein the troughs extend separately from each other to the small ends of the connecting elements.

"17. A snap hinge according to claim 16, wherein the small ends of the connecting elements terminate in troughs.

"18. A snap hinge according to claim 15, wherein the large ends of the connecting elements face each other and are provided with ribs, which extend transversely to the main geometric axis.

"19. A container closure for sealing off the neck of a container, the closure comprising:

"a body for connecting with the neck of the closure and having a dispensing opening for the dispensing of the contents of the container;

"a lid for sealing off and permitting the opening of the dispensing opening in the body;

"connecting means for hingedly connecting the lid to the body so that the lid may be shifted about a main geometric axis between the sealing off position and the opening position at which the dispensing opening is, respectively, sealed off and opened, the connecting means including a film hinge disposed along the main geometric axis about which the lid pivots between the sealing off position and the opening position;

"a pair of opposed connecting elements interposed between the lid and the body on opposite sides of the film hinge, each connecting element having a relatively small substantially pointed end facing the end of the opposed connecting element;

"divergent film hinges having a connecting element interposed therebetween hingedly connecting each connecting element to the lid and the body, the film hinges being divergent and inclined with respect to the main geometric axis;

"the connecting elements being spring-like troughs symmetrical with respect to the main geometric axis, the troughs being resilient to bias the lid relative to the body at a location between the sealing off position and the opening position and having a dead center biasing position at one side of which the lid is biased to the sealing off position and at the other side of which the lid is biased to the opening position.

"20. A closure according to claim 19, wherein the troughs are disposed inwardly of the lid and body when in the sealing off position.

"21. A closure according to claim 19, wherein the troughs are disposed outwardly of the lid and body when in the sealing off position.

"22. A closure according to claim 19, wherein, in section, each trough has a height and a width, the height being smaller than the width.

"23. A closure according to claim 19, wherein the body and lid have circular cross-section and the film hinges connecting the connecting elements to the lid and body being disposed in the circles of the lid and body both in the sealing off position and opening position.

"24. A container closure for sealing off the neck of a container, the closure comprising:

"a body for connecting with the neck of the closure and having a dispensing opening for the dispensing of the contents of the container;

"a lid for sealing off and permitting the opening of the dispensing opening in the body;

"connecting means for hingedly connecting the lid to the body so that the lid may be shifted about a main geometric axis between the sealing off position and the opening position at which the dispensing opening is, respectively, sealed off and opened, the connecting means including a hinge film disposed along the main geometric axis about which the lid pivots between

the sealing off position and the opening position;

"a pair of opposed connecting elements interposed between the lid and the body on opposite sides of the film hinge, each connecting element having a relatively small substantially pointed end facing the end of the opposed connecting element;

"divergent film hinges having a connecting element interposed therebetween hingedly connecting each connecting element to the lid and the body, the film hinges being divergent and inclined with respect to the main geometric axis;

"the connecting elements being spring-like troughs symmetrical with respect to the main geometric axis, the troughs being resilient to bias the lid retention relative to the body to the opening position, the troughs biasing the lid to the opening position when in the sealing off position; and retention means overcoming the bias of the troughs when the lid is in the sealing off position releasably retaining the lid in the sealing off position and for permitting the lid to be manually released to the opening position.

"25. A receptacal comprising:

"a body;

"a lid for closing and opening the body;

"connecting means for hingedly connecting the lid to the body so that the lid may be shifted about a main geometric axis between the closing position and the opening position, the connecting means including a hinge film disposed along the main geometric axis about which the lid pivots between the closing position and the opening position;

"a first pair of opposed connecting elements interposed between the lid and the body on opposite sides of the film hinge, each connecting element having a relatively small substantial pointed end facing the end of the opposed connecting element;

"another pair of connecting elements interposed between the lid and the body and between the first pair and having relatively large ends facing each other;

"divergent film hinges having a connecting element interposed therebetween hingedly connecting each connecting element to the lid and the body, such film hinges being divergent and inclined with respect to the main geometric axis;

"the connecting elements being spring-like troughs symmetrical with respect to the main geometric axis, the troughs being resilient to bias the lid relative to the body at a location between the closing position and the opening position and having a dead center biasing position at one side of which the lid biased to the closing poisition and at the other side of which the lid is biased to the opening position."

From the claims and the inventor's description, it appears that the invention involves a lid and base which are linked by a connecting element. I note that certain embodiments of the invention suggest that the inventor contemplated use of a distinct element that connected two portions of the lid to two portions of the base. Other embodiments suggest it is one element, half of which lies on the lid and half on the base.

In any event, on the top and bottom of the connecting unitary, flexible element is a pair film hinges, one set links the lid to the element and one set links the element to the base. Deposition of Barry Wolf at 39, 57–58.

The hinges diverge from the geometric axis about which the lid and base articulate and about which these objects are in circular movement in relation to each other. Id. at 43, 47–48.

In other words, the hinges diverge or are inclined away from the plane upon which the lid sits when it is closed. In his deposition, Dr. Wolf stated that the use of divergent film hinges are a primary teaching of the Weisinger patent. In at least one embodiment, the bottom hinges are placed below the plane or axis described above such that they actually rest on the wall of the base.

The placement of the hinges and connecting element allows the lid to be flipped from the base and remain open in a position where the lid rests somewhere between 90 degrees and 180 degrees from the

base. The hinges and connecting element remain in tension as the lid is moved from one position to another and when the lid is open. When the lid is open, it moves up and away from the plane and the connecting element similarly moves out and away from the base. When lid is closed, the elements and hinges lie along the wall of the closure with little or no protrusion. In some embodiments of the invention, the element actually becomes compressed into a recessed portion of the base.

By agreement consumated on June 3, 1983, plaintiff became the owner and licensor of this patent. *See* plaintiff's answer to defendant's Interrogatory No. 5; affidavit of Jochen Koehn, notarized May 10, 1988, at Paragraph 2. Plaintiff has licensed many companies to manufacture and market the closure, including licensees in which plaintiff has an ownership interest. *See* deposition of Mr. Koehn at 40–55. Plaintiff has two licensees in North America, Zeller Closure, known until 1987 as DTC, which is located at the same address as Zeller Corporation, and Seaquest Division of Pittway Corp. Id. at 40, 44–45.

These licensees pay yearly royalties to plaintiff, the patent owner. *See* affidavit of Eugene Dorsch, notarized May 10, 1988, at Paragraphs 1–3. Through the marketing efforts of these entities, approximately 200 million Weisinger closures were sold in the United States in 1987. Id. at Paragraphs 8–9. Projections reveal that sales are expected to double in 1988. Id. at Paragraph 8. I note, however, that "based on available U.S. Census Bureau statistics and projected sales figures, Zeller closures will supply less than one percent of the market in plastic dispensing closures in 1988." Affidavit of Eugene Dorsch, dated April 25, 1988, at Paragraph 7.

By letter dated April 16, 1987, counsel for plaintiff advised defendant that "it has come to our attention that you are now manufacturing and selling snap hinge closures that are unquestionably an infringement of the rights and coverage granted by our client's patent." *See* letter from John Kurucz, Esq., to Joyce Molding Corp., dated April 16, 1987, attached as Exhibit 15 to

defendant's response brief by letter dated June 8, 1987.

Mr. Kurucz sent counsel for defendant a copy of photographs and an actual specimen of the accused cap. *See* Id. at Exhibit 17.

In response, defendant's counsel informed plaintiff's counsel of its contention that the accused product "is an improvement" on defendant's own patented hinge, U.S. Patent No. 4,503,991, which defendant asserts "is based upon an entirely different principle from that which is alleged to be the basis of the closure set forth in the '712 patent." *See* Id. at Exhibit 18.

For the record, I note that on January 6, 1984, Michael Joyce applied for a patent on his "two part snap hinge," which received its patent on March 12, 1985. This patent corresponds to an invention that

"relates to an improved biasing or snap hinge preferably made of two thermoplastic parts connected together by an integral hinge. . . .

"Integral hinges are well known in the art but such hinges have traditionally required a spring to produce the snap action. Applicant's hinge consists of two hinge members hinged together along a curved line. . . . When the hinge member is moved further [from either the first or second position], the energy is released thereby giving a biasing force and eliminating the need of the spring yet retaining its function. . . . The internal stress of the hinge functions as a spring, biasing in hinge members to one or other stable positions."

*See* Patent No. 4,503,991, Column 1, Lines 6–59, attached as Exhibit 13 to defendant's response brief.

The patent specifically cites and discusses the prior art embodied in Weisinger's patent. In this regard, the Joyce patent notes that the Weisinger patent "discloses a container and lid with an opening closed by a flap formed integrally with the remaining part of the lid. The lid is elastically deformable and is moved from a closed position to an open position in response to pressure on a minor portion of the lid. A disadvantage of this hinge is the added

complexity, cost of manufacture and inherent lack of uniformity of function and reliability." *See* Id. Column 2, Lines 9–17.

As an alternative, Joyce's patented closure states that it "offers an improved two part hinge ... made of two parts integrally molded together which is simple in construction, economical to manufacture and simple and efficient to use." Id. at Column 2, Lines 22–25.

The 19 claims of this invention are as follows:

"1. A hinge including a swingable portion, a reference portion, and a reduced connecting portion between said swingable portion and said reference portion, said reduced connecting portion being integral with said swingable portion and said reference portion and extending continuously between a first point and a second point in a manner such that said reduced connecting portion follows a path which is displaced from a straight line connecting said first and second points whereby upon swinging said swingable portion about said reduced connecting portion said swingable portion swings through an intermediate position such that on either side of said intermediate position said swingable portion is urged away from said intermediate position.

"2. The hinge of claim 1, wherein on one side of said intermediate position said swingable portion is urged into a first bowed configuration and on said other side of said intermediate position said swingable portion is urged into a second bowed configuration, said first and second bowed configurations comprising configurations bowed on opposite sides of the plane of said swingable portion.

"3. The hinge of claim 1, wherein said swingable portion, said reference portion and said reduced connecting portion comprise molded plastic.

"4. The hinge of claim 1, wherein said swingable portion comprises a closable portion for a container and said reference portion comprises at least a portion of one wall of said container.

"5. The hinge of claim 1, wherein said intermediate position comprises said swingable portion and said reference portion being generally located in a common plane.

"6. The hinge of claim 1, wherein said path lies substantially in the plane of said reference portion.

"7. The hinge of claim 1, wherein said path lies substantially perpendicular to the plane of said reference portion.

"8. The hinge of claim 1 including urging means for urging said reduced connecting portion into said path displaced from a straight line connecting said first and second points.

"9. The hinge of claim 8, wherein said urging means comprises reference portion deforming means for deforming said reference portion into a substantially arcuate configuration.

"10. The hinge of claim 9, wherein said reference portion deforming means comprises pintle means attached to said reference portion.

"11. The hinge of claim 1, wherein said swingable portion, said reference portion and said reduced connecting portion comprise thermoplastic material.

"12. The hinge of claim 1, wherein said swingable portion, said reference portion and said reduced connecting portion comprise thermosetting material.

"13. The hinge of claim 1, wherein said swingable portion and said reference portion each comprises a substantially planar plate portion, and at least one of said substantially plate portions is bowed.

"14. The hinge of claim 13, wherein said at least one of said substantially planar plate portions is bowed substantially in the form of a portion of a cylinder.

"15. The hinge of claim 13, wherein both of said substantially planar plate portions are bowed.

"16. The hinge of claim 15, wherein both of said substantially planar plate portions are bowed substantially in the form of a portion of a cylinder.

"17. The hinge of claim 1 including a reference hinge member attached to said reference portion whereby said reference portion may be caused to swing about said reference hinge member between first and second reference portion positions.

"18. The hinge of claim 17, wherein said reference hinge member is integral with said reference portion.

"19. The hinge of claim 17, wherein said swingable portion, said reference portion and said reduced connecting portion form the lid for a container."

I further note that on February 23, 1988, again citing to the Weisinger patent, among others, Joyce obtained patent No. 4,726,091, for which he applied on September 8, 1986, as a continuation of his prior art. *See* Exhibit 14 to defendant's response brief. He describes this invention as relating "to an improved biasing or snap hinge preferably made of two thermoplastic parts connected together by an integral reduced portion." *See* patent No. 4,726,091, Column 1, Lines 6–9. The 22 claims of this patent are as follows:

"1. A container comprising a container body and a lid therefor, said container body including depending wall means extending from said lid and defining an inner container space including an access opening into said inner container space, whereby said lid provides closure means for said access opening into said container space, said lid including a unitary hinge including a substantially planar swingable portion having a first thickness, a substantially planar reference portion having a second thickness, and a substantially linear connecting portion having a reduced thickness substantially less than said first and second thicknesses, said substantially planar swingable portion and said substantially planar reference portion merging continuously into said substantially linear connecting portion whereby when said substantially planar swingable portion and said substantially planar reference portion are aligned in a substantially common plane, said hinge comprises a substantially smooth and uninterrupted surface, said substantially linear connecting portion being integral with said substantially planar swingable portion and said substantially planar reference portion and extending continuously between a first point and a second point in a manner such that said substantially linear connection portion follows a path which is displaced from a straight line connecting said first and second points and which lies in a plane substantially perpendicular to the plane of said substantially planar reference portion of said hinge, whereby upon swinging said substantially planar swingable portion about said connecting portion said substantially planar swingable portion swings through an intermediate position such that on one side of said intermediate position said substantially planar swingable portion is urged into a first bowed configuration and on the other side of said intermediate position said substantially planar swingable portion is urged into a second bowed configuration, said first and second bowed configurations comprising configurations bowed on opposite sides of the plane of said substantially planar swingable portion into open and closed positions corresponding to said first and second bowed configurations are derived from oppositely directed stresses created within said substantially planar swingable portion on opposite sides of said intermediate position.

"2. The container of claim 1, wherein said substantially planar reference portion of said lid includes a first end corresponding to said connecting portion and a second end displaced from said connecting portion, and wherein said substantially planar reference portion comprises a plurality of paths between said first and second ends having a degree of curvature which is substantially continuously reduced as compared to that of said path of said connection portion.

"3. The container of claim 1, comprising molded plastic.

"4. The container of claim 1, wherein said lid includes a reference hinge member attached to said substantially planar reference portion whereby said substantially planar reference portion may be caused to swing about said reference hinge member

between first and second reference portion positions.

"5. The container claim 4, wherein said reference hinge member is integral with said substantially planar reference portion.

"6. The container of claim 1, wherein said path comprises a plurality of substantially linear path portions.

"7. The container of claim 1, wherein said lid includes a reduced portion having a predetermined shape abutting said connecting portion and being integral with said substantially planar swingable portion, said reduced portion having a reduced thickness as compared to said first thickness of said substantially planar swingable portion.

"8. The container of claim 7, wherein said predetermined shape of said reduced portion is substantially arcuate.

"9. The container of claim 7, wherein said predetermined shape of said reduced portions is substantially parabolic.

"10. A container comprising a container body and a lid therefor, said lid including a substantially planar lid portion having a first thickness, said container body including a base portion and side wall means extending from said base portion, a predetermined portion of said side wall means comprising a substantially planar reference portion for said substantially planar lid portion, said substantially planar reference portion having a second thickness and being connected to said substantially planar lid portion by a substantially linear connecting portion having a reduced thickness substantially less than said first and second thicknesses and providing a hinge therefor, said substantially planar reference portion and said substantially planar lid portion merging continuously into said connecting portion whereby when said substantially planar reference portion and said substantially planar lid portion are aligned in a substantially common plane, said hinge comprises a substantially smooth and uninterrupted surface, said substantially planar reference portion including a first end connected to said base portion and a second end corresponding to said connecting portion, said substantially planar lid portion being swingable about said connecting por-

tion between a closed position in which said lid is in contact with said side wall and an open position, and said connecting portion being molded into a configuration such that it follows a path which is displaced from a straight line connecting the ends of said connecting portion, whereby said substantially planar lid portion is swingable from said closed position to said open position through an intermediate position such that on either side of said intermediate position said substantially planar lid portion is urged away from said intermediate position towards said open and closed positions, respectively, whereby the forces urging said substantially planar lid portion into said open and closed positions are derived from oppositely directed stresses created within said substantially planar lid portion.

"11. The container of claim 10, wherein said reference portion comprises a plurality of paths between said first and second ends having a degree of curvature which is substantially continuously reduced as compared to that of said path of said connecting portion.

"12. The container of claim 10 comprising molded plastic.

"13. The container of claim 12, wherein said plastic comprises a thermoplastic material.

"14. The container of claim 12, wherein said plastic comprises a thermosetting material.

"15. The container of claim 10, wherein said connecting portion follows a path comprising a plurality of substantially linear path portions.

"16. A container comprising a container body and a lid therefor, said lid including a substantially planar reference portion having a first thickness, a substantially planar swingable portion having a second thickness and a substantially linear connecting portion having a reduced thickness less than said first and second thicknesses, said substantially planar reference portion and said substantially planar swingable portion merging continuously into said connecting portion whereby when said substantially planar swingable portion and said substan-

tially planar reference portion are lying in a substantially common plane, said substantially planar reference portion including a first end and a second end, said first end of said substantially planar reference portion being connected to said said [sic] container body and said second end of said substantially planar reference portion corresponding to said connecting portion, said substantially planar swingable portion including a first end and a second end, said first end of said substantially planar swingable portion corresponding to said connecting portion and said second end of said substantially planar swingable portion being adapted to swing between a closed position in contact with said container body and an open position, said connecting portion being integral with both said substantially planar reference portion and said substantially planar swingable portion and extending continuously between a first point and a second point on opposite sides of said lid in a manner such that said connecting portion follows a path which is displaced from a straight line connecting said first and second points so that the portion of said connecting portion intermediate of said first and second points is displaced from said second end of said substantially planar swingable portion as compared to said first and second end of said connecting portion.

"17. The container of claim 16, wherein said container body includes a base and a plurality of side wall members extending therefrom, and wherein said substantially planar reference portion of said lid is hingedly attached to one of said plurality of sidewall portions of said container body.

"18. The container of claim 16, wherein said container body and said lid comprise unitary molded plastic body.

"19. The container of claim 16, wherein said lid includes a reduced connecting portion integral with said swingable portion and said remaining portion of said lid.

"20. The container of claim 19, wherein said substantially planar swingable portion is thinner than said remaining portion of said lid.

"21. The container of claim 19, wherein said connecting portion is substantially arcuate.

"22. The container of claim 20, wherein said connecting portion is substantially parabolic."

While the parties have offered no expert interpretation of this patent, my own observations reveal that the inventor apparently envisioned various embodiments of this two-part hinge. Of particular interest here is his embodiment as illustrated in figures 36 and 37 of the patent.

In those diagrams and corresponding descriptions, it appears that he envisioned a portion of the eliptical-shaped hinge to lie on the circular wall of the base of the cap and a portion of the hinge to actually be a component of the top of the lid. The two portions of the hinge are connected by a third hinge. Since a part of the hinge is a nonmovable portion of the surface wall, it would not be distorted by the force of movement of the lid. Thus, the force is absorbed in the lid.

On the lid, however, the main hinge is segregated by an indentation in the shape of the hinge which prevents the distortion caused by movement from effecting the remaining portion of the lid. Hence, it appears that this integrally molded unit has an eliptical-shaped hinged portion which straddles both the lid and base, and is connected to these elements by two ends of a reduced central hinge, which, when moved, does not distort the main portion of the lid or the base in any way.

Defendant asserts that this patented hinge is the basis upon which it designed the orange peel closure which plaintiff contends infringes upon the Weisinger patent.

At my request, the parties have provided a specimen of both the Weisinger invention and the allegedly infringing item. In addition, their experts have provided their own description.

Dr. Towns, defendant's expert, has described the Joyce product as follows:

"The Joyce 'orange peel' closure has two pivot points which restrict the relative movement of the cap and base in

reference to one another. Between these two points is a single, oval-shaped member, which I would call a 'diaphragm.' One long edge of the diaphragm rests in a groove formed on the outside of the cap. When the Joyce closure is moved from an open position (in which it must be molded) to a closed position, it passes through an equilibrium point.

"During the movement, the 'diaphragm' is placed somewhat under compression while the pivot points react and are thus in tension. In addition, the oval shape of the seam between the diaphragm and the base of the cap causes the hinge to flex from one position, through an equilibrium position into another position."

Declaration of Edward Towns at Paragraph 21.

Dr. Towns further states that unlike the Weisinger closure, the Joyce cap has only one unitary, curved connecting element between the two film hinges which are connected to the lid and base. *See also* deposition of Michael Joyce at 117.

Towns also notes that the connecting element becomes compressed, rather than stretched, when moved from one position to another. Declaration of Dr. Towns at Paragraph 22–24. *See also* deposition of Michael Joyce at 116–18, who states that the orange peel goes through compression when it passes the center line.

Dr. Wolf, expert for plaintiff, stated, however, that the connecting element is placed in tension during movement and that the lid and base are connected at three places, including at the two pivot points. *See* declaration of Barry Wolf at Paragraph 41, 21–26, dated June 16, 1986.

Furthermore, in his description of the Joyce closure, Dr. Wolf noted that the flexible connecting element lies between two film hinges which themselves are attached to the lid and base respectively. He states that the distinct portions of this flexible connecting element have been placed with the large ends facing each other. Dr. Wolf asserts that this is merely a transposition of the Weisinger connecting element in which the portions of the connecting element lie with the smaller ends facing each other and that this transposition is suggested in the language of the Weisinger patent. Deposition of Dr. Wolf 39, 57–58. He further states that this transposition is merely cosmetic in nature and does not alter the structure or function of the closure. *Id.* at 37, 76; Exhibit B to affidavit of Dr. Wolf.

My own examination of the specimen reveals that the Joyce closure is a one-piece unit with two pivot points, one on each side of an oval connecting element, which lie almost parallel with the plane on which the lid would rest when it is closed. The hinges at these points protrude slightly when the lid is in a closed position. In addition, there are also curved hinges which merge with element that connects the lid and base. Finally, it appears that this central element is in extreme tension when the lid is moved from one position to another.

In addition to informing plaintiff that the closure at issue is based upon its own patented cap, defendant also informed plaintiff of its failure to cite several references to that patent office which defendant contends are relevant to the validity of the Weisinger patent. In this regard, defendant stated, in its letter of July 13, 1987, that the failure to cite these references during the application process "demonstrate[s] a serious disregard of the applicant's duty of candor before the United States Patent and Trademark Office." *See* letter of defendant's counsel to plaintiff's counsel dated July 13, 1987 attached as Exhibit 18 to defendant's brief.

In a subsequent letter, dated August 7, 1987, defendant's counsel drew plaintiff's counsel attention to, *inter alia,* the Boyd, McGhie, Palazzolo, and Krawagna patents, as well as to German, British and Canadian patents. *See* defendant's Exhibit 19.

Defendant has specifically drawn the Court's attention to the Boyd, McGhie and Palazzolo patents as representing examples of three pieces of prior art that anticipate plaintiff's patented invention and thereby calls into question the validity of that patent.

First, defendant draws the Court's attention to Patent No. 1,928,445, which was issued on September 26, 1933, to a Mr. Boyd.

According to the Boyd patent, the object of this invention was to provide "a closure member, forming part of, or adopted to be attached to, a container which can be manipulated with one hand, and which forms an efficient, sanitary and convenient stopper for the mouth of the container. To this end [the] invention is specifically characterized by a novel form of hinge by which the closure member is joined to a stationary member at the mouth of the container." *See* the Boyd patent, Column 1, Lines 26–35, attached as defendant's Exhibit 9.

Thereafter, Boyd patent lists three claims:

"1. In combination with a container having a substantially cylindrical member at the mouth thereof, a closure member adapted to fit over said cylinder member, and a hinge of elastic material attached to said cylindrical member and closure member, the attaching surfaces of said hinge extending sufficiently around the circumferences of said cylindrical member and closure member whereby portions of said hinge serve as tension springs holding the closure member away from the mouth of the container when the closure member is in fully open position, mouth of the container when movement in that direction is initiated.

"2. In combination with a container having a substantially cylindrical member at the mouth thereof, a closure member adapted to fit over said cylindrical member, said members being recessed at regions of their exterior surfaces, and a hinge of elastic material attached to said cylindrical member and closure member and fitting in the recessed regions thereof, the attaching surfaces of said hinge extending sufficiently around the circumferences of said cylindrical member and closure member whereby portions of said hinge serve as tension springs holding the closure member away from the mouth of the container when the closure

member is in fully open position, and forcing the closure member toward the mouth of the container when movement in that direction is initiated.

"3. In combination with a container having an externally threaded projection at the mouth thereof, an internally threaded cylindrical member engaging said projection, a closure member adapted to fit over said cylindrical member to close the mouth of said container, and a hinge of elastic material attached to said cylindrical member and closure member, the attaching surfaces of said hinge extending sufficiently around the circumferences of said cylindrical member and closure member whereby portions of said hinge serve as tension springs holding the closure member away from the mouth of the container when the closure member is in fully open position, and forcing the closure member toward the mouth of the container when movement in that direction is initiated."

The claims of the patent and description therein reveals Boyd's 1933 attempt to create a closure that permitted a lid to be attached to a container. In his invention, the lid and base of the closure are separate pieces, connected by flat bands placed in the recesses of the exterior surface of these components and a connecting hinge of elastic material comprised of a hinged portion and tension springs. *See* declaration of Dr. Edward Towns at Paragraphs 7–8; Dr. Barry Wolf at Paragraph 3; deposition of Dr. Wolf at 95.

This hinged element has a pivot point about which the lid moves into one of two positions: opened or closed. *See* declaration of Edward Towns at Paragraph 6.

For example, when the lid was pushed from a closed position to an open one, the connecting element is tensioned and opposed to any movement. Once the lid is pushed beyond the pivot point, it would snap to a position of 180 degrees and remain fully opened.

When the lid is moved toward the closed position, the hinged element remains tense and opposes movement of the lid toward the base—but once the lid is pushed past

the pivot point, the hinged element tends to snap the lid shut. Thus, the elastic nature of the hinged element, which is one item that connects the base and lid, urges the lid toward the container to return the element to its flat shape—either horizontally when the lid is open or vertically when it is shut.

I note, however, that the central portion of the hinge—i.e., the pivot point, becomes distorted when the lid is fully opened. I also note that the hinge component does not narrow toward the midpoint.

Second, defendant cites Patent No. 3,933,271, which was issued to Russell McGhie on January 20, 1976. Citing to, *inter alia*, the Boyd patent, McGhie patent states that the invention "overcomes the problems of the prior art by providing an integrally molded captive cap assembly including a threaded base for attachment to a toothpaste tube and a lead tube which projects into the hollow cap which is pivotally connected to the base." *See* Patent No. 3,933,271, Column 1, Lines 39–46, attached as Exhibit 10 to defendant's response brief.

In the patent, McGhie makes the following 9 claims:

"1. A captive cap comprising a hollow base, a hollow lead tube projecting from and communicating with said hollow base, means for attaching said hollow base to a container, a cap having a hollow portion, said hollow lead tube projecting toward said cap and proportioned to reside within said cap when said cap is closed onto said hollow base, a hinge member disposed between said hollow base and said cap, at least one spring member disposed between said hollow base and said cap and spaced apart from said hinge member and with said spring member having a first end pivotally attached to said hollow base, a second end pivotally attached to said cap, and a curved portion joining said first end and said second end, said cap including a protuberance extending from the inner surface of said cap and said hollow base having a complimentary recess on its outer surface said protuberance being disposed to lodge in said complimentary recess when said cap is closed onto said hollow base for reversibly locking said cap onto said hollow base.

"2. A captive cap according to claim 1, wherein said curved portion is bounded by two parallel cylindrically curved surfaces.

"3. A captive cap according to claim 1, wherein there are a pair of spring members disposed spaced apart from said hinge portion and positioned one at each end of said hinge member.

"4. A captive cap according to claim 1, wherein said spring member has a uniform cross section.

"5. A captive cap according to claim 1, wherein said cap, and base, and spring member and said hinge member comprise an integrally molded assembly.

"6. A captive cap according to claim five, wherein said pivotal attachment of said spring member to said hollow base and said cap comprise integrally molded members.

"7. A captive cap comprising a hollow base, a hollow lead tube having an outer surface with a first conical configuration, projecting from and communicating with said hollow base, means for attaching said hollow base to a container, a cap having a hollow interior defined by an inner wall having a second conical configuration, said hollow lead tube projecting toward said cap and proportioned to reside within said cap when said cap is closed onto said hollow base, a hinge member disposed between said hollow base and said cap, at least one spring member disposed between said hollow base and said cap and spaced apart from said hinge member and with said spring member having afirst [sic] end pivotally attached to said hollow base, a second end pivotally attached to said cap, and a curved position joining said first end and said second end, said first and second conical configurations being mutually parallel and complimentary, said cap including a protuberance extending from said inner wall and said hollow base having a complimentary recess on said outer surface said protuberance being disposed

to lodge in said complimentary recess when said cap is closed onto said hollow base for reversibly locking said cap onto said hollow base.

"8. The captive cap of claim 7, wherein said recess is disposed oppositely from said hinge member.

"9. The captive cap of claim 7, wherein said protuberance has a rounded surface."

In the McGhie patent, the lid and base are a one-piece unit integrally connected by two molded curved spring members, or loops. The top and bottom of each of the loops, which protrude from the body of the closure, are connected to hinges which are, in turn, joined to the lid and base of the closure, respectively.

In addition, there is a separate hinge component which is disposed apart from these hinges and spring elements. The top portion of the base is tapered and has a protrusion that fits snugly into the bottom of the lid and thereby operates to lock the lid to the base. The inner portion of the base of the closure has a lead tube which has a threaded interior into which the top portion of the container could be affixed.

The inside of the lid has a hollow space in which the mouth of the container maybe placed. When the lid is opened or closed, the distance between the hinges connected to the lid and base is equal. This distance changes, however, when the lid is an intermediate position. I note that when the lid is past this intermediate position, the spring loops operate to force the lid shut.

Finally, defendant points out the existence of Patent No. 3,135,456, issued to Frank Palazzolo on June 2, 1964, which "relates to a flexible hinge device in combination with a container and a cover having mating curved side portion and, in particular, to a flexible hinge, container and cover combination in which the hinge is connected along the curved side surface of the container and the cover." *See* Patent No. 3,135,456, Column 1, Lines 8–13, attached as Exhibit 11 to defendant's response brief.

The six claims of this patent are as follows:

"1. The combination of two coextensively arranged curved surfaces which abut along an edge with each other at a common line of separation, and a hinge member connecting the two coextensive curved surfaces together across their common line of separation, said member being formed of flexible material fixed at its opposite end portions to each of the coextensive curved surfaces except for a freely movable web portion intermediate said fixed opposite end portions, said freely movable web portion terminating along a pair of oppositely disposed curved lines scored into the flexible hinge material at each side of the line of separation of the two surfaces, with each of said oppositely disposed curved lines receding from said line of separation on each of said coextensive curved surfaces, whereby when one curved surface is articulated relative to the other, a double hinge effect is achieved at and along the scored curved lines.

"2. The combination of a container and a cover, each having a curved side portion coextensive with the other in abutting relationship along a common line of separation, and a hinge member connected across the mated curved side portions, said member being formed of flexible material fixed at its opposite end portions to the coextensive curved side portions of the cover and container except for a freely movable web portion intermediate said fixed opposite end portions, said freely movable web portion terminating at the fixed end portions along a pair of oppositely disposed curved lines scored into the flexible hinge material at each side of the line of separation formed by the cover and the container, with each of said oppositely disposed curved lines receding from said line of separation on each of said coextensive curved side portions, whereby when the cover is lifted from the container a double hinge effect is achieved at and along the scored curved lines.

"3. The combination of a container and a cover, each having a curved side portion of cylindrical configuration coextensive with the other in abutting rela-

tionship along a common line of separation, and a hinge member connected across the abutting cylindrical side portions, they are subtended by said hinge member being less than 120 [degrees], said member being formed of flexible resilient material fixed at its opposite end portions to the coextensive cylindrical side portions of the cover and container except for a freely movable web portion intermediate said fixed opposite end portions, said freely movable web portion terminating along a pair of oppositely disposed curved lines scored into the flexible resilient hinge material to each side of the line of separation formed by the cover and the container, with each of said oppositely disposed curved lines receding from said line of separation on each of said coextensive cylindrical side portions and having radius of curvature in the neighborhood of the radius of curvature of the abutting cylindrical side portions, whereby when the cover is lifted from the container a double hinge effect is achieved at and along the scored curve lines.

"4. The combination of claim 3, wherein the arc subtended by the hinge member does not exceed about 90 [degrees].

"5. The combination of claim 3, wherein the flexible resilient hinge material has substantially elastomeric properties.

"6. The combination of claim 3, wherein the hinge material is made of polypropylene."

The Palazzolo patent protects a "flexible hinged device for containers having a curved side." Here, the inventor connected the lid of a container, rather than a closure, with its base, by joining the two with a single flexible strip affixed to the lid and container by adhesive. Part of the strip rests freely where the lip of the lid fits snugly into the mouth of the container. This webbed portion terminates where it is scored in a semicircular or eliptical manner on symmetrical points of the lid and container. The radius of the curved scored hinges is contemplated to be sufficient only so as to not put too much strain on the

flexible material. As the patent contemplates a freely movable webbed portion which provides no resistance to opening or closing of the lid, Dr. Wolf noted that the closure has no snap effect. See deposition of Wolf at 119–20, affidavit of Wolf at Paragraph 11. But see declaration of Towns at Paragraph 13, in which he stated that he believes the closure has a snap. Hence, the hinge device has been described not as a snap hinge, deposition of Mr. Shroeder at 27, but rather as a tether, Wolf deposition at 113–14.

In response to these letters, plaintiff's counsel informed defendant's counsel that it had "concluded that U.S. Patent No. 4,303,712 is valid and enforceable, and under the circumstances ... insist[ed] that [Joyce] cease and desist from further infringement on this patent." See defendant's Exhibit 2, a letter dated September 24, 1987, from John Kurucz to Arnold Krumholz.

As plaintiff believed defendant did not cease and desist from the allegedly infringing conduct of producing the Joyce closure, plaintiff instituted the present litigation and has requested the issuance of preliminary injunctive relief.

In support of its request, plaintiff argues it is the assignee of a valid patent issued by the U.S. Patent Office and that it is entitled to protection from infringement thereon. Plaintiff also asserts that the validity of this patent is further manifested by the public's acquiescence to the invention as revealed by the fact it has gained industry-wide acceptance and has been successful in the marketplace.

Plaintiff also contends that the nonobvious nature of its invention is evidenced by the fact Joyce copied the snap hinge. Moreover, plaintiff argues that it obtained its patent in light of the relevant prior art and that the art to which the defendant has called the Court's attention does not anticipate the Weisinger patent. Relatedly, plaintiff states that defendant has not demonstrated that the inventor's failure to bring these references to the attention of

the Patent Office constitutes inequitable conduct.

Plaintiff also argues that in light of the similarities between its patented cap and the Joyce closure with respect to their structure, operation and result and since the claims of '712 can be read—upon the Joyce closure, defendant's product clearly infringes upon plaintiff's patent.

For these reasons, plaintiff asserts that it is likely to succeed on the merits of its claim that defendant's product, literally and under the doctrine of equivalents, infringes upon its patent. Plaintiff also argues that absent an injunction to prohibit this infringing conduct, plaintiff will be irreparably harmed since it will lose market shares, its growth in the market will be stifled, and its commercial reputation will be injured.

In addition, plaintiff claims that absent such relief prices of its licensees may be undercut and hence result in a loss of business, good will and credibility.

Finally, plaintiff argues that the equities of public policy support issuance of an injunction in this case in light of the effort it has made to develop customers, good will and the market, in comparison to the minimal cost and effort defendant has expended in copying plaintiff's product. Moreover, plaintiff asserts that public policy favors protection of the rights of patent owners and this policy is advanced when infringement upon those rights is prohibited.

In response, defendant contends that plaintiff is unlikely to successfully litigate the merits of its claim since it owns an invalid patent which embodies an invention anticipated by and obvious from the prior art. Moreover, defendant asserts that the patent is unenforceable in light of the patent applicant's breach of the duty of candor as it failed to cite relevant prior art to the Patent Office.

Defendant also asserts that as plaintiff's patent was issued in 1983, it does not represent an invention upon which there has been "*long* continued public acquiescence" from which validity may be presumed. Relatedly, defendant contends that plaintiff has not demonstrated that the patented product itself is related to the commercial success or that the sales of the product represent a substantial share of the market.

Defendant also argues that plaintiff has not supported its claim of copying, particularly in light of defendant's history of developing hinged closures. Defendant also claims the product in question does not literally infringe on plaintiff's product nor can it be found to be an infringing product under the doctrine of equivalents since the two caps achieve their functions in different ways.

Defendant contends further that plaintiff has not proven irreparable harm in light of its invalid patent, the absence of infringing activity, its delay in seeking emergent relief, and the lack of actual damages given the fact defendant has sold no closures.

Defendant also argues that the equities balance in its favor since the issuance of the injunction will result in the waste of funds expended in the manufacture and development of the product, and will injure defendant's reputation. Moreover, defendant argues its sales will not deprive plaintiff of its market share.

In addition, defendant contends that public policy militates against the issuance of the injunction in light of the invalidity of the patent, the inventor's inequitable conduct and plaintiff's unclean hands, as revealed by the conduct of its licensees in spreading rumors regarding defendant's allegedly infringing conduct and the alleged existence of an injunction in response to same.

In light of the above factual context and arguments, I make the following conclusions of law:

Article I, Section 8, Clause 8 of the United States Constitution specifically empowers Congress to "promote the progress of science and the useful arts." To this end, Congress has established a scheme whereby inventors may obtain patents on their inventions which gives them the right to exclude others from making, using or selling the patented invention for a period of 17 years.

The statutory framework under which patent protection is provided sets forth various mechanisms through which a patent owner may protect its rights. For instance, in order to prevent violation of any right secured by patent, the statutes vests the district court with the discretion to issue injunctive relief. 35 U.S.C. Section 283; *Datascope Corp. v. Kontron, Inc.,* 786 F.2d 398, 399 (Fed.Cir.1986).

Under the laws of the Federal Circuit, which is the binding precedent on issues of patent law, *see Libbey–Owens Ford Co. v. BOC Group, Inc.,* 655 F.Supp. 897, 906 (D.N.J.1987), and cases cited therein, in order to obtain a preliminary injunction in a patent infringement action, the movant must demonstrate that:

    a.  it has a reasonable likelihood of success on the merits;

    b.  without the relief it will suffer irreparable harm;

    c.  a balance of the hardships tip in its favor; and

    d.  that the issuance of the injunction is in the public interest.

*See e.g. T.J. Smith & Nephew, Ltd. v. Consolidated Medical Equipment,* 821 F.2d 646, 647 (Fed.Cir.1987); *Windsurfing International, Inc. v. AMF, Inc.,* 782 F.2d 995, 999 (Fed.Cir.1986); *Datascope, supra,* at 400. No one element is dispositive; rather each must be weighed against the other. *Datascope, supra,* at 400.

With respect to the first element, the movant bears the burden of showing a likelihood of success on the merits. *Atlas Powder Co. v. Iveco Chemicals,* 773 F.2d 1230, 1233–34 (Fed.Cir.1985).

Hence, in this case, plaintiff must demonstrate by a preponderance of the evidence that defendant engaged in conduct which infringes upon plaintiff's patent. *Under Sea Industries, Inc. v. Dacor Corp.,* 833 F.2d 1551, 1557 (Fed Cir.1987); *Uniroyal, Inc., v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1054 (Fed.Cir.1988).

In response to this contention, defendant Joyce asserts that plaintiff has no protectible interest since the patent is invalid as it is anticipated by the prior art and obvious.

*See* 35 U.S.C. Sections 102 and 103, respectively.

Patents are issued to inventions that are new, useful and nonobvious. *See* 35 U.S.C. Section 101. Once granted, the patent is presumed valid. 35 U.S.C. Section 282. To rebut this presumption, one who attacks the validity of the patent bears the burden of persuasion with respect to invalidity and to succeed in its challenge must prove by clear and convincing evidence that the patent should no longer be accepted as valid. *See Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 986 (Fed.Cir.1988); *Uniroyal, Inc., supra,* at 1050; *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987); *Verdegaal Bros., Inc. v. Union Oil Co. of California,* 814 F.2d 628, 631 (Fed.Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987); *Carella v. Starlight Archery & Pro Line Co.,* 804 F.2d 135, 138 (Fed.Cir.1986); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed.Cir.1983).

The Supreme Court defines clear and convincing evidence as proofs which "place in the ultimate factfinder an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *See Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 2437–38, 81 L.Ed.2d 247 (1984).

In this instance, I must determine whether or not defendant has demonstrated by clear and convincing evidence that the patented invention is anticipated and obvious and hence not validly patentable.

    With respect to the assertion that an invention is considered anticipated, and therefore lacks novelty, it must be demonstrated each and every element of the claimed invention is present in the "four corners" of a single prior art, either expressly described therein or under the principle of inherency. *See, e.g., Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d 744, 747 (Fed.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988) and cases cited therein; *Akzo N.V. v. United States International Trade Commission,* 808 F.2d 1471, 1479 (Fed.Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987); *Verdegaal Bros.,*

*supra; Rolls–Royce Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1105 (Fed.Cir.1986); *Kalman v. Kimberly Clark Corp.,* 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). The absence from the prior art reference of any claimed element negates anticipation. *See Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1571 (Fed. Cir.1986), *cert. denied sub nom., Stora Kopparbergs Bergslags AB v. Crucible, Inc.,* 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed. 2d 836 (1987).

Thus, the party "asserting [that] a patent claim is anticipate[d] must demonstrate, among other things, identity of invention." *See Kalman, supra.* "Identity of invention is determined by reference to the language of the patent claims, which [themselves] define the ambit of the claimed invention." *Roberts v. Sears & Roebuck & Co.,* 723 F.2d 1324, 1333 (7th Cir.1983).

Hence, a determination of anticipation may be reached by comparing the claims in the patented invention with the prior art disclosed by the patent challenger. Under this perspective and pursuant to the current statute, a patented invention may be said to have been anticipated if the prior art would literally infringe upon the challenged patent had that prior art been invented after the patent which is challenged. *See Lewmar, supra,* at 747. This analysis thereby vividly demonstrates the lack of novelty of an invention. *Id.* at 748.

In the case at bar, defendant contends that the Weisinger invention is anticipated by the prior art embodied in the Boyd, McGhie and Palazzolo patents. A comparison of the claims embodied in Weisinger with those embodied in these three prior art references, however, reveals that no one of these references contain each of the claims embodied in the patent in question.

At the outset, I note that while these inventions all address various ways of creating a closure whereby the lid remains attached to either the base of the cap or base of the container, each operate in different ways. On this basis, it appears that they each embody novel inventions. More-

over, none of these prior art references achieve the end of attaching a movable lid to a container in the same way as the invention embodied in the Weisinger patent.

A review of the Weisinger claims reveals, *inter alia,* that a pair of film hinges are directly attached to the lid and to the wall of the base of the cap. These hinges rest at angles which diverge from the top portion of the base, or the axis about which the lid and base meet when the lid is closed. The inclination of these hinges is a primary component of claim 1 of the invention. As this aspect of the invention does not appear in the four corners of either the Boyd, McGhie or Palazzolo patents, I do not find that defendant has proved by clear and convincing evidence that the Weisinger patent is invalid as anticipated since each and every element of the claimed invention is not present in the four corners of the prior art references cited to the Court.

■ . Defendant also attacks the validity of the patent at issue as being obvious. Section 103 of Title 35 states that:

"A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

An analysis of the obviousness of an invention therefore must include consideration of the following factors:

1, the scope and content of the prior art and what it discloses to those skilled in the art;

2, the differences between the prior art and the claims at issue;

3, the level of the ordinary skill of the art at the time the invention was made; and

4, the objective evidence of nonobviousness, such as commercial success, long-felt, but unresolved needs, failure of others, copying and unexpected results. *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545

(1966); *Uniroyal, supra,* at 1050; *Akzo, supra,* at 1480; *Specialty Composites, supra,* at 991, (nexus between commercial success and merits of the invention); *Windsurfing, supra,* at 1000 (copying).

To evaluate a claim of nonobviousness, the Court must "step backward in time and into the shoes worn by that 'person' when the intention was unknown and just before it was made. In light of all the evidence, the decisionmaker must then determine whether the patent challenger has convincingly established, 35 U.S.C. Section 282, that the claimed invention as a whole would have been obvious at *that* time to *that* person. 35 U.S.C. Section 103."

*Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1566 (Fed.Cir.1987) (emphasis in original, footnotes omitted); *Uniroyal, supra,* at 1050. *See also Windsurfing, supra,* at 999 in which the court acknowledged that to examine the question of the obviousness of the invention, it is necessary to look at the claimed invention at the time it was made.

In addition to viewing the prior art from a position of one of ordinary skill in the light of the art that existed at the time the invention was made, the Court may also consider "whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness of making the combination ... of the prior art to achieve the invention at issue." *Grain Processing Corp. v. American Maize Products,* 840 F.2d 902, 907 (Fed.Cir.1988) (citations and quotation marks omitted). Hence, there must be a teaching or suggestion in the prior art, taken as a whole, that would lead one with ordinary skill in the art to combine the prior art references. *Uniroyal, supra,* at 1051. The mere suggestion by an expert is insufficient. *Id.*

The analysis of a claim of nonobviousness begins with a determination of what the claim's invention is, when reviewed as a whole. *Panduit, supra,* at 1567–68. This factor requires the Court to interpret the claims of the invention in light of the claim language, other claims, and prosecution history. *Id.* at 1567–68.

Next, the Court must examine the prior art. As stated previously, elements of separate prior patents cannot be combined in an effort to demonstrate obviousness when there is no suggestion of such combination anywhere in those patents. *Id.* at 1568.

With respect to defendant's claim that the Weisinger invention is obvious, I note that looking from a perspective in the years prior to 1983, when the patent issued, and upon consideration of the scope and content of the prior art and the level of skill in the art at that time, it does not appear by clear and convincing evidence that the hinge cap at issue would have been obvious from the prior art, singly or in combination with any one of the art references cited here.

Specifically, the invention claimed involves a one-piece unit which functions as a cap for sealing the neck or opening of a container. The lid is attached to the base by means of a connecting element which is interposed between two pairs of hinges. The hinges diverge from the main *pivot* point in such a manner as to cause the lid to flip up and pull away from the base when opened. It is interesting to note that the lower set of hinges, which connect the connecting element to the base, diverge below the above-described plane or axis, such that the hinges actually rest on the upper portion of the wall of the base. The claims further reveal that the connecting elements, together with the hinges, form a butterfly or bow tie shape and the body of the butterfly, or knot of the bow tie, form a pivot point or aperture. The claims also reveal that the connecting elements protrude slightly when the lid is closed.

Comparing this invention to the prior art, it has not been proven by clear and convincing evidence that the prior art suggests the obviousness of combining the elements contained therein in the way defendant suggests which demonstrates that obviousness of the Weisinger patent. Rather, each of the prior art references represent different hinged caps and nothing therein would necessarily lead one skilled in the art to combine these references to arrive at the Weisinger invention.

First with respect to the Boyd patent, the claims reveal the attachment of a lid to the container itself, rather than to the base of a separate cap, that is then attached to the container. In addition, the hinged element remains in tension, irrespective of whether it is in movement or at rest.

Second, in the McGhie patent, while the lid and base of the closure are contemplated to be a unit separate and apart from the container, the lid and base of the one piece unit are connected to one another by a pair of loops that protrude from the body of the closure.

Moreover, rather than being a part of the hinges themselves, the loops are separate from the hinge component. While it is arguable that the patent may be read to suggest the use of one loop, there is no suggestion of the use of a connecting element and hinge that are merged into one component, as is the case in the Weisinger patent.

Finally, with respect to the Palazzolo patent, it appears that the patent addresses the combination of a cover and a container, each with curved sides. While, like Weisinger, it embodies the use of more than one hinge, the hinges are achieved by the placement of a freely movable web that is created by the attachment of a piece of flexible material which transcends portions in the area near the location where the lid and container separate when the lid is opened. A semicircle or eliptical curve is scored into the material, on each side of the area where the lid and container meet. It is along these lines that the hinge effect occurs.

The defendant has failed to demonstrate by clear and convincing evidence that these patents teach the use of divergent hinges on a cap which is not permanently attached to a container. Hence, defendant has not carried its burden of proof at this time to demonstrate that singly, or in combination, these patents render the Weisinger invention invalid as obvious to one of ordinary skill in the art prior to 1982. As stated previously, the Weisinger invention specifically contemplates (1) the use of hinges that diverge from the area where the lid and base meet when the lid is closed; (2) hinges that are fused with the connecting element where the pivot point exists; and (3) hinges which can be used on more than just containers with curved sides.

Hence, while the record does not demonstrate that plaintiff's lid fulfilled a long-felt but unresolved need, given the existence of other patented flip-top lids prior to 1983, nor does the record suggest that the invention improved on the failure of others or that the patented invention achieved unexpected results, I do not find these objective considerations influence the lack of clear and convincing evidence that plaintiff's patent is obvious from the prior, particularly in light of the above comparison between the patent at issue and the prior art cited to this Court. Hence, I cannot declare this patent invalid on this basis at this time.

■ Defendant also claims that the patent is unenforceable because the patent applicant engaged in inequitable conduct during the prosecution of the patent application by not presenting to the examiner the Palazzolo patent; a patent that defendant contends renders the Weisinger invention nonpatentable.

To render a patent unenforceable on this basis, the challenger must establish by clear and convincing evidence that the applicant engaged in a material misrepresentation or omission of information and did so with an intent to mislead. *Akzo, supra,* at 1481; *Specialty Composites, supra* at 991; *Allen Organ Co. v. Kimball International, Inc.,* 839 F.2d 1556, 1568 (Fed.Cir.1988); *Under Sea Industries, Inc. v. Dacor,* 833 F.2d 1551, 1557 (Fed.Cir.1987).

Information is material if there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether or not to issue the patent. *Akzo, supra,* at 1481; *Specialty Composites, supra,* at 992.

With respect to proof of intent, the defendant need not prove "deliberate scheming," rather the defendant need only demonstrate gross negligence, beyond mere

oversight, negligence or an error in judgment made in good faith. *Id.* at 992.

Once the thresholds of both materiality and intent are met, the Court may then balance these factors to see if "the scales tilt to a conclusion that inequitable conduct occurred." *Allen Organ Co., supra,* at 1556. In this balancing process, the Court may find that the more material the omission or misrepresentation, the less level of intent need be shown to conclude that the patent applicant engaged in inequitable conduct. *Akzo, supra,* at 1481–82. Similarly, if the Court concludes that a reasonable examiner may find the information important, but not crucial to his determination not to reject a patent application, the defendant must bring forth facts which indicate something more than gross negligence and recklessness, absent which proof of the exercise of judgment in good faith or an honest mistake may be a sufficient defense. *American Hoist and Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1363 (Fed.Cir.1984) *cert. denied sub nom., Sowa & Sons, Inc. v. American Hoist and Derrick Co.,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Moreover, if the Court finds the applicant knew of the publication or prior art, but defendant has failed to adduce evidence of intentional or grossly negligent failure to draw the examiner's attention to same, the test for inequitable conduct has not been met and the patent will not be found to be unenforceable on this basis. *See Grain Processing, supra,* at 907.

Although in evaluating the issue of inequitable conduct the Court need not make explicit findings on whether the undisclosed art anticipates or renders nonobvious the invention in question, *Gardco Mrg. v. Herst Lighting Co.,* 820 F.2d 1209, 1214 (Fed.Cir.1987), the discussion *supra* reveals my conclusion that defendant has failed to demonstrate by clear and convincing evidence that the Palazzolo patent either anticipates or renders obvious the Weisinger patent.

Moreover, as the information in the patent has not been proven to be crucial to the issuance of the patent, as it does not render it invalid, I do not find that defendant proved it to be material in this instance at this time by clear and convincing evidence.

Finally, while there is no dispute that the patent applicant had been aware of the Palazzolo patent, the defendant has failed to demonstrate that it was withheld in a grossly negligent manner. Even assuming the information withheld would have been important to the patent examiner in his evaluation of the application, defendant has failed to prove by clear and convincing evidence that it was withheld in a reckless or grossly negligent way. At best, the record reflects that the applicant made a judgment that he did not believe the reference to have been material to the U.S. prosecution of the application in light of the breadth of the claims.

For these reasons, I do not find defendant has demonstrated by clear and convincing evidence that the inventor engaged in inequitable conduct and therefore I do not find the patent to be unenforceable on this basis at this time.

As defendant has failed to demonstrate by clear and convincing evidence that plaintiff's patent is invalid or unenforceable, I now turn to an evaluation of the likelihood plaintiff has of demonstrating by a preponderance of the evidence that defendant engaged in patent infringement. *See e.g. ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1582; *Uniroyal, supra,* at 1057.

■ Infringement involves the appropriation of the novelty of a patented device. *FMC Corp. v. Hennessy Industries, Inc.,* 836 F.2d 521, 527 (Fed.Cir.1987). Infringement is determined by comparing the accused product with the invention set forth in the claim. *Perini America, Inc. v. Paper Converting Machine,* 832 F.2d 581, 586 (Fed.Cir.1987).

Hence, "an issue of infringement raises two fundamental questions: One, what is patented—this requires interpretation of the scope and meaning of the claim language; and two, whether the patent, so interpreted, is infringed—whether what is claimed has been made, used or sold by

another." *Specialty Composites, supra,* at 986.

In light of these questions, the first step in determining infringement is to construe and determine the scope and meaning of the claims. *Fonar Corp. v. Johnson & Johnson,* 821 F.2d 627, 631 (Fed.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 751, 98 L.Ed.2d 764 (1988) and cases cited therein; *Uniroyal, supra,* at 1054. The threshold requirement of claim construction is an examination of the claim at issue, the terms of which will be given their ordinary meaning, unless it appears that the inventor used them differently. *ZMI Corp., supra,* at 1579. In such a case, the Court must resort to the specifications of the patent and its prosecution history to determine if the inventor used disputed terms differently than their ordinary accustomed meaning. *Id.; Fonar, supra,* at 631; *Specialty Composites, supra,* at 987. In addition, the Court may consider expert testimony including evidence of how those skilled in the art would interpret the claims. *Fonar, supra,* at 631.

With respect to the specification, I note that "the descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based upon the description. The specification is, thus, the primary basis for construing the claims." *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir. 1985).

The embodiments appearing in the specification will not generally be read into the claim since what is patented is not restricted to examples, but is defined by the words of the claim and in reference to other claims if the claims are supported by the specifications in a manner required by 35 U.S.C. Section 112. *Speciality Composites, supra,* at 987.

Relatedly, the Court may look to the prosecution history to determine what interpretations of the claims may be excluded as they have been disclaimed or disavowed during the prosecution of the patent. *Standard Oil, supra,* at 452.

Finally, with respect to expert opinion, I note that if the evidence of infringement consists only of expert opinion, without supporting tests or data, the district court is under no obligation to accept it. *W.L. Gore Associates, Inc. v. Garlock, Inc.,* 842 F.2d 1275, 1280 (Fed.Cir.).

The second step in determining infringement is to decide whether properly interpreted claims encompass the allegedly infringing product by applying the claims to the accused structure. *Id.; Grain Processing, supra,* at 908. In this regard, a finding of infringement requires proof that every limitation in the patent claim is found in the accused device either literally or under the doctrine of equivalents. *ZMI Corp., supra,* at 1582.

Literal infringement requires that every limitation of the patent claim must be found in the accused device. *Uniroyal, supra,* at 1054. When literal infringement is not found, the Court may consider whether the accused product infringes under the doctrine of equivalents. *Id.* at 1057. A finding of infringement under this doctrine depends on whether the accused device performs substantially the same function as the patented invention in substantially the same way to achieve the same result. *Id.*

Applying the above analysis to the case at bar, I find that the scope and meaning of claim 1 of the Weisinger patent reflects, *inter alia,* the inventor's focus on the use of hinges which diverge from or are inclined from the main plane upon which the lid rests when it is closed. In addition, claims 1–5 pertain to the use of connecting elements, interposed between the hinges, and separated from one another by an aperture.

I note here that Dr. Wolf once described this as a single connecting element, of which one half is connected to the lid and the other half to the base. On another occasion, however, Wolf described this portion of the invention as involving two connecting elements which link the lid and base. Hence, plaintiff's own expert does not clearly explain which is the appropriate interpretation of the claims. This lack of

clarity, however, can be explained by the fact that the claims refer both to the singular "connecting element" and the plural "connecting elements" and by the fact that the component in question is not separate but rather is one part of the one piece unit.

Nonetheless, the connecting component is sandwiched between the hinges which are connected to the lid and base, respectively. In at least one embodiment, each portion of this connecting component has a small somewhat pointy end, that points toward the center portion of the connecting element.

I must now determine whether or not plaintiff has proven by a preponderance of the evidence that the Zeller cap infringes upon the Weisinger invention, either literally or under the doctrine of equivalents.

A comparison of the claims of the Weisinger invention with those revealed in the Joyce closure demonstrates that each cap has a base and lid which close at a common plane, and are linked by a flexible, flat connecting element interposed between film hinges. The small ends of the connecting element of the Joyce closure are pointed in opposite directions while the smaller ends of the Zeller cap are pointed toward one another. *See* affidavit of Dr. Wolf, dated May 6, 1988, Exhibit A. This transposition, however, is "taught by the ... Weisinger patent." As Dr. Wolf stated, "there are words in the Weisinger patent that describe that you can put the large ends facing each other. So that type of connecting element is completely described in the Weisinger patent." Deposition of Dr. Wolf at 57–58.

This observation is reflected in claim 18 of the Weisinger patent wherein the inventor states that "the large ends of the connecting elements [of the snap hinge] face each other," as well as in Column 6, Lines 66–67 in which the inventor notes that in at least one embodiment of this invention "the large ends of the connecting elements ... are adjacent to each other and merge one into the other continuously."

In both Joyce and Weisinger, Dr. Wolf notes that the connecting element is linked to the base and lid by curved hinges or divergent hinges which diverge from the main axis. Deposition of Dr. Wolf at 74–75. For these reasons, Dr. Wolf has concluded that the "Joyce hinges are the same as those disclosed and claimed in the 4,403,-712 patent in every respect." Affidavit of Dr. Wolf, dated May 6, 1988, at Paragraph 10.

Relatedly, he asserts that the Joyce closure has "the same structure, function in the same manner and have the same result as the snap hinge of 4,403,712." *Id.* at Paragraph 8.

I find his analysis of the claimed invention and accused product persuasive and thereby conclude that plaintiff has a reasonable likelihood of success proving by a preponderance of the evidence that defendant has engaged in infringement under the doctrine of equivalents. First, the parties agree that the closures each perform the same function and achieve the same result; second, plaintiff has demonstrated a reasonable likelihood of proving by a preponderance of the evidence that both caps achieve this result in the same manner.

The caps each are one piece units, with a lid and base linked by a connecting element sandwiched between curved or angled hinges. The lids flip away from the base and expose an opening through which the contents of the container may be dispensed. The discrepancies in the structure of these closures are, such as with respect to the tension under which the hinges are placed during movement and the manner in which the hinges diverge, that is straight as opposed to curved, are distinctions without a difference with respect to the manner in which the lids operate. Thus, for these reasons, I find that plaintiff has proven a reasonable likelihood of success in proving defendant infringed on his patent.

■ Turning now to a determination of whether or not plaintiff will suffer irreparable harm without injunctive relief, I note that such harm will be presumed if plaintiff has demonstrated by a preponderance of the evidence that defendant infringed upon his valid patent. *See Datascope, supra,* at 400; *H.H. Robertson, supra,* at 390. As

defendant has not proven by clear and convincing evidence that plaintiff's patent is invalid, the presumption of validity remains. Furthermore, as stated previously, plaintiff has demonstrated its likelihood of success in proving by a preponderance of the evidence that defendant has infringed on its patent. Hence, given the likelihood of infringement on this valid patent, irreparable harm absent injunctive relief shall be presumed.

■ This presumption is not rebutted even by the fact defendant has not yet marketed its product and hence cannot be said to have caused plaintiff any actual injury, since defendant's ability to enter the market is reflected in the record and, hence, the threatened injury is imminent. Given the imminent likelihood of defendant's entry into the market with its infringing product, injunctive relief is warranted.

Moreover, the balance of the hardships tip in favor of the patent owner, who has a strong interest in protecting its patent rights and a concomitant right to enjoy the benefits of a commercially successful patent. The efforts related to the production and marketing of this invention should not be dissipated through the perpetration of another's wrongful conduct. Thus, although defendant has also expended funds and effort to develop its product, it is not entitled to have such efforts protected when they are in infringement of another's invention.

Finally, public policy favors protection of the rights of patent owners. Relatedly, it is beyond peradventure that a valid patent should be shielded from infringement. As defendant's conduct threatens these interests, public policy supports the issuance of equitable relief.

■ · Hence, for all of these reasons, I grant plaintiff's request for preliminary injunctive relief. I do so, however, mindful of defendant's assertion that plaintiff has "unclean hands." In support of this defense, in which Joyce asserts that plaintiff badgered Joyce's potential customers and spread rumors regarding defendant's alleged infringement, defendant submitted only hearsay evidence through an affiant, without any corroboration. Although hearsay evidence may be considered in the context of a request for a preliminary injunction, I do not find the evidence in this instance to be sufficiently persuasive or weighty to justify erecting an unclean hands' defense as a bar to the preliminary relief at this time.

Finally, with respect to defendant's request to add Pittway Corporation as a counterclaim defendant, I shall refer this matter to U.S. Magistrate Stanley R. Chesler to be returnable November 14, 1988.